**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
MORALES ELECTRICAL CONTRACTING,
INC.,

                    Plaintiff,

          -against-

SIEMENS BUILDING TECHNOLOGIES,
INC.,

                    Defendant.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
09-CV-2743 (ADS)(ETB)

**APPEARANCES:**

**Vandenberg & Feliu LLP**
Attorneys for the Plaintiff
60 East 42nd Street, 51st Floor
New York, NY 10165
        By: Raymond L. Vandenberg, Esq.
           Robert B. Bernstein, Esq.
           Debra Kobrin Levy, Esq.
           John C. Ohman, Esq., Of Counsel

**Venable LLP**
Attorneys for the Defendant
1270 Avenue of the Americas
New York, NY 10020
        By: Lawrence H. Cooke, III, Esq., Of Counsel

**SPATT, District Judge**.

       This lawsuit arises out of a subcontract that Morales Electrical Contracting, Inc.

("Morales" or "the Plaintiff") entered into with Siemens Building Technologies, Inc. ("Siemens"

or "the Defendant") for the purpose of performing electrical work on a project at the JetBlue

Airways terminal at John F. Kennedy International Airport ("JFK"). Presently before the Court

is a motion by the Defendant for summary judgment dismissing all of the Plaintiff's claims, or,

in the alternative, partial summary judgment limiting the Plaintiff's available damages.  For the

reasons set forth below, the motion is denied in its entirety.

## I.  BACKGROUND

Unless otherwise indicated, the following constitutes the undisputed facts of the case

derived from the parties' submissions, accompanying affidavits, and Local Rule 56.1 Statements.

### A.  Factual Background

On March 23, 2006, Turner Construction Company ("Turner") and Siemens entered into

a contract ("the Turner-Siemens Contract") whereby Siemens agreed to undertake a construction

project at the JetBlue Airways terminal at JFK ("the JetBlue Project").  Pursuant to the Turner-

Siemens Contract, Siemens agreed to perform and furnish all work, labor, services, materials,

parts, equipment, tools, scaffolds, appliances and other things for Facility Management Systems

(Control) Work on the Project (the "FMS Work").  (Def.'s 56.1, ¶ 6.)  Incorporated into the

Turner-Siemens Contract was the General Provisions document issued by Turner and dated

March 20, 2006, ("Turner General Provisions"), which in turn incorporated a Turner Project

Master Schedule dated March 21, 2006 (the "Project Master Schedule").  The parties dispute

whether the Project Master Schedule was a multi-page detailed schedule, or a one page bar chart

summary.  Because the initialed schedule appended to the Turner-Siemens Contract was the one

page bar chart summary, for the purposes of this motion, the Court will refer to the bar chart as

the "Project Master Schedule".  The Project Master Schedule identifies two milestones for the

JFK Project:  Temporary Certificate of Occupancy on or before July 1, 2008, and Substantial

Completion on or before August 1, 2008.  (Id., ¶ 11.)  In addition, page 3Y of the Turner General

Provisions identifies a requirement to provide temporary heat, stating:

> For temporary heating/cooling seasons, all HVAC control work for
> the AHU"s shall be complete to run equipment as a stand-alone

control system from the control panel furnished and installed by
the FMS subcontractor.  Metering system must be functional
during temporary operation.

(Id., ¶ 72.)  The parties agree that this language indicates that temporary heat

would need to be provided by the fall of 2007.

By letter, dated April 18, 2006, Siemens Account Executive Geralyn Spadafino contacted

Alan Smith, the Vice President of Morales to solicit a bid for the electrical installation portion of

the FMS work ("the Work"), which stated that Morales should base its bid on 14 identified

categories of information, including the Turner General Provisions, and various sketches,

drawings, and diagrams that described the nature of the electrical work that Siemens sought

("Invitation to Bid").  (Id., ¶ 29.)  The Invitation to Bid stated that Morales should "please let us

know if you are missing any information" and invited Smith to contact Spadafino if Morales

required any further information in order to prepare a bid.  (Id., ¶ 71.)  Siemens states that all of

the documents listed on the Invitation to Bid, including the Turner General Provisions and the

Project Master Schedule, were transmitted to Morales as part of the "Bid Package".  (Id., ¶ 30.)

Morales denies that it received the Turner General Provisions or Project Master Schedule, and

states that it only received electrical drawings and mechanical drawings dated "1/17/06" through

Addendum #34, 23 hand-drawn sketches and certain building management system specifications.

(Pl.'s 56.1, ¶ 30.)  In addition, Morales states that Siemens could not have sent the Turner

General Provisions with the Invitation to Bid because evidence indicates that Siemens did not

have the final version of the document as of that date.  (Id.,  ¶¶ 10, 53.)

On May 16, 2006, Smith called Spadafino in order to determine when Siemens expected

the work to be completed.  According to Morales, Spadafino told Smith that the Work would

begin in late 2006 and was to be completed in late 2008.  (Id., ¶ 32.)  For its part, Siemens states

that Spadafino represented that the JetBlue Project was to be completed in late 2008, not the

Work.  (Def.'s 56.1, ¶ 32.)  It is undisputed that during this conversation, Smith did not ask for a copy of the Turner General Provisions or any documented project schedule, and that Spadafino did not refer Smith to the Turner General Provisions or the Project Master Schedule for information about the duration of the JetBlue Project or the Work.

By letter dated May 17, 2006, Morales submitted an initial bid of $1,585,000 that it stated was based in part on the Invitation to Bid "1-page coversheet dated 4/18/06" and "Siemens one line diagrams 23 pages" ("Initial Bid").  (Spadafino Decl., Ex. B.)  Subsequently, on August 30, 2006, another Morales employee, Giacomo Grandi, attended a meeting with Siemens employees Richard Dillon, William Anderson and Robert Hayes at Siemens' office in Pine Brook, New Jersey (the "Pine Brook Meeting").  The Pine Brook Meeting was a "scope review" meeting, to allow potential contractors to ask questions about the scope of the electrical installation work in order to assist them in preparing their bids.

The parties dispute whether and to what extent Hayes informed Grandi that the scope of the project was more expansive than what was reflected in the 23 pages of hand-drawn sketches transmitted with the Bid Package.  At this meeting, Grandi was given access to a submittal book with information about the project (the "August Submittal Book").  The August Submittal Book contained several changes from the drawings and diagrams included with the Invitation to Bid. Although Grandi admits he was given the opportunity to look at the book and ask questions about it, the parties dispute whether Grandi was aware that the August Submittal Book contained material changes from the 23 hand-drawn sketches, and also dispute whether Grandi was given a copy of the August Submittal Book to take back to Morales.  Morales asserts that Grandi could not have meaningfully reviewed the August Submittal Book at the Pine Brook Meeting because "the book consisted of several hundred pages of detailed shop drawings that were not capable of

any meaningful "review" in one sitting".  (Pl.'s 56.1, ¶ 83.)

In a letter, dated September 5, 2006, Smith wrote to Siemens's project manager, Robert Hayes, to break down the prices of Morales' revised bid, and stating "Completion is based on 12/08".  (Morales Designee Dep., Ex. 9.)  Subsequently, Smith had a conversation with Dillon to discuss whether Morales could lower its final bid by $100,000.  (Smith Dep., 103–04.) Neither Dillon, Hayes, nor any other Siemens representative disputed Smith's understanding of the target completion date, sought to clarify whether Morales understood that the JetBlue Project completion date was December 2008, or referred Morales to the Turner General Provisions or Project Master Schedule.

On September 13, 2006, Morales submitted a second and final bid of $1,485,000, which was accepted by Siemens.  (Def.'s 56.1 ¶¶ 94–95.)  On October 25, 2006, the parties' agreement was formalized in a written contract ("the Subcontract").  The parties dispute whether the Subcontract incorporated the Turner-Siemens Contract, the Turner General Provisions, and the Project Master Schedule.  However, there is no dispute that these documents were not attached to the Subcontract, and that no one at Morales read these documents prior to signing the Subcontract.

The provision of the Subcontract addressing the schedule for the project stated that "SUBCONTRACTOR shall commence the Work on September 21, 2006 and shall prosecute the Work diligently as required by the project schedule to allow for project completion on or before December 2008" (the "Term Provision").   The parties dispute whether the reference to "project" means the entire JetBlue Project or the FMS Work, and whether "project completion" refers to final completion or substantial completion.   In addition, the Subcontract contained a provision

allowing for the parties to enter "[s]pecific scheduling milestones and coordination requirements" ("the Milestone Provision"). However, this provision was left blank.

Other relevant portions of the Subcontract include: (1) a waiver by Morales of its reliance on any prior oral or written statements, agreements, or representations ("the Merger Clause"); (2) a provision authorizing Siemens by written order "to make changes in the Work, or the conditions under which it is to be performed, or . . . increase or decrease the services to be performed" and stating that Morales "acknowledges and agrees that it waives all right or claim for compensation for any additional or other work not specifically authorized in writing by [Siemens] prior to the commencement of such work"; (3) a limitation on consequential damages; and (4) a jury waiver for certain disputes.

Although the parties disagree about what documents constituted the Subcontract and the meaning of specific provisions, Morales does not dispute that its principal, Alan Smith, read the entire Subcontract carefully before signing it and made handwritten changes. In particular, Smith added to Article 1.3 of Exhibit A to the Subcontract listing the relevant scope documents the words "Morales quote dated 9-13-06" in the list of "Project Plans and Specifications" and "4-18-06 23 pages of panels, sketches, (i) riser diagram (1) scope page" following the term "Siemens Building Technologies submittal dated." (Def.'s 56.1, ¶ 105.)

On or about October 31, 2006, Morales began its work on the JetBlue Project. (Def.'s 56.1, ¶ 134.) According to Morales, after it began the work, it made numerous requests for a copy of a detailed trade-by-trade project master schedule. Although Siemens admits it did not respond to these requests, Siemens contends that it was not in possession of an accurate detailed schedule that it could provide Morales, and that all relevant scheduling information was available

at the weekly foreman meetings, which a Morales representative could have attended, but did not.

On April 3, 2007, Hayes sent Smith a copy of the Project Master Schedule, which Morales contends was insufficient because it did not include information about the electrical installation work, and did not disclose the temporary heat deadline.  (Def.'s 56.1, ¶ 196, Pl.'s 56.1, ¶ 196.)  In July 2007, Siemens and Turner began meeting with Morales to review the progress of the FMS electrical installation as it pertained to the requirement to provide temporary heat.  (Def.'s 56.1, ¶ 161.)  Following this meeting, Turner directed Siemens to provide Morales with a comprehensive project schedule.  On July 16, 2007, Siemens provided Morales with a Draft Preliminary Schedule with a run date of November 30, 2006, ("Turner November 30th Draft Schedule").  According to Morales, the Turner November 30th Draft Schedule was not the latest draft, and, in any event, for the first time showed that Morales needed to substantially complete  its Work by October 2007.

Morales met the temporary heat deadline in November 2007.  The parties dispute whether this constituted the "substantial completion" of Morales's work.  Morales continued working on the JetBlue Project until January of 2009.  However, Morales contends that in the last five months of 2008, it worked at the site only seven days and that the work it performed was change order work that was not part of the Subcontract.  (Pl.'s 56.1, 230–32.)

Between October 6, 2006, and December 22, 2008, Morales made 134 Change Order requests for work performed that it believed was outside the scope of the original Subcontract.  (Def.'s 56.1, ¶ 201.)  Morales submitted change order requests totalling $746,136.97 and accepted payments from Siemens in respect of these change orders in the amount of $421,177.18.  Siemens contends that Morales was adequately compensated for the additional work it performed.  Morales disagrees, and claims it accepted lesser amounts for the work

because: (1) it had to substantially complete its work in one year instead of the two years called for in the Subcontract; (2) it had already been directed to perform the work and had expended resources to do so; and (3) it was under "extreme financial duress" to accept amounts below what it was rightfully owed because the amounts were offered on a "take-it-or-leave-it" basis. (Pl.'s 56.1, 204–22.) The parties dispute whether the amount of change orders was typical for a project as large and complex as the work Morales was performing. (Def.'s 56.1, ¶ 224; Pl.'s 56.1, ¶ 224.) In total, Morales received $1,966,471.74 for its work on the JetBlue Project. (Def.'s 56.1, ¶ 225.)

**B. Procedural History**

On August 26, 2009, Morales filed an Amended Complaint against Siemens asserting the following five causes of action: (1) Siemens fraudulently concealed information it was obligated to disclose regarding the scope and duration of the JetBlue Project in order to induce Morales into submitting a lower bid for the Subcontract; (2) Siemens fraudulently induced Morales to enter into the Subcontract by misrepresenting the scope of the JetBlue Project and the duration of time Morales would have to complete the Work; (3) Siemens breached the Subcontract by expanding the scope of the Work and accelerating Morales's time to complete it (the "acceleration breach of contract claim"); (4) Siemens breached the Subcontract by failing to pay fair value for the additional work reflected in four change orders; and (5) Siemens breached the Subcontract by refusing to compensate Morales for the additional work associated with ten other change orders (together with the fourth cause of action the "scope breach of contract claims"). According to Morales, as a result of the acceleration and expanded scope of the Work, it was forced to incur additional costs beyond those it had contemplated in bidding on the Subcontract

and ultimately led to the loss of its business, resulting in Morales being unable to repay millions

of dollars in loans and the loss of millions of dollars in future profits. (Pl.'s 56.1, Add'l 46–50.)

In a Memorandum of Decision and Order dated February 16, 2010, the Court denied

Siemens' motion to dismiss the Amended Complaint and permitted Morales to have an

additional opportunity to amend the complaint to plead their scope fraud claims with greater

particularity. (Docket Entry #29.) On March 8, 2010, Morales filed the Second Amended

Complaint asserting the same causes of action, but providing additional detail about Siemens

alleged misrepresentations about the scope of the work.

On August 29, 2011, Siemens filed the instant motion for summary judgment and on

February 21, 2012, the Court held oral argument on the motion.

## II. DISCUSSION

### A. Standard of Review – Fed. R. Civ. P. 56

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears

the burden of establishing the absence of a genuine issue of material fact. See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is

"material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the

outcome of the suit under the governing law." Id. at 248, 106 S. Ct. 2505. An issue is "genuine"

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the

underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the

light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B.  Whether the Defendant is Entitled to Summary Judgment on the Plaintiff's Fraudulent Inducement and Fraudulent Concealment Causes of Action**

The Plaintiff's fraudulent concealment and fraudulent inducement claims relate to alleged misrepresentations and omissions relating to the duration of the Work ("duration fraud") and the scope of the Work ("scope fraud"). As an initial matter, the Court notes that the Defendant moves for summary judgment on the ground that the Plaintiff's fraud claims are duplicative of the Plaintiff's breach of contract claims. This same argument was raised by the Defendant and rejected by this Court in its February 16, 2010 decision on the Defendant's motion to dismiss. The summary judgment record does not alter the Court's finding on this issue and therefore the Court finds that there are genuine issues of material fact precluding the Court from dismissing the fraud causes of action as duplicative of the breach of contract causes of action.

With respect to the duration fraud claim, the Plaintiff contends that the Defendant orally represented that it had until December 2008 to substantially complete the Work and that the Defendant confirmed this representation through the Term Provision of the Subcontract. The Plaintiff further alleges that this representation was false, because it had only one year to substantially complete its work insofar as its work had to be substantially complete by the October 2007 temporary heat deadline. According to the Plaintiff, Siemens was aware that the Work would have to be substantially completed within one year based on conversations with Turner, the Turner General Provisions, and versions of a project master schedule within its possession, but concealed this information from the Plaintiff in order to induce a lower bid.

The Plaintiff's scope fraud claims are premised on the allegations that, the Defendant was aware that it was basing its bid on the 23 pages of hand-drawn sketches it received with the Bid Package, and that, based on the detailed shop drawings in the August Submittal Book, the Defendant knew that the scope of the Work was more expansive than what was contained in the 23 pages of hand-drawn sketches.

The Defendant mainly contends that it is entitled to summary judgment on the scope and duration fraud causes of action because the Plaintiff's reliance on its alleged misrepresentations and omissions with respect to the scope and duration of the Work was unreasonable as a matter of law. In particular, the Defendant argues that the Plaintiff's reliance was not justified because: (1) the Plaintiff disclaimed reliance on any prior oral or written agreements in the Merger Clause of the Subcontract; (2) the Plaintiff failed to exercise reasonable diligence in the review and/or pursuit of relevant documents; and (3) the terms of the documents incorporated in the Subcontract expressly contradict the purported misrepresentations and omissions.

### 1. Merger Clause

Article 4.3 of the Subcontract states in relevant part:

> The documents referenced in sections 4.1 and 4.2 constitute the entire Subcontract between CONTRACTOR and SUBCONTRACTOR and supersede all prior and contemporaneous negotiations, statements, representations, agreements, letters of intent, awards, or proposals, either written or oral. . . .

Contrary to the Defendant's contention, the fact that the Subcontract contained a provision generally disclaiming reliance on oral or written representations does not render the Plaintiff's reliance unreasonable as a matter of law.

Under New York law, "the introduction of extrinsic evidence with regard to a fraud in the inducement claim is a well-known exception to the parol evidence rule." Petrello v. White, 412 F. Supp. 2d 215, 226 (E.D.N.Y. 2006). Although New York law "has foreclosed parol evidence where the contract includes a negotiated merger clause or an explicit disclaimer regarding the same subject matter as the alleged oral representation", Wall v. CSX Transp., Inc., 471 F.3d 410, 416, 416 n.5 (2d Cir. 2006) (citations omitted), "a general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud", Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993). Thus, where, as here, "[t]he merger clause contains the standard boilerplate that typifies a general merger clause, and does not contain any language specific to the representations at issue", it will not preclude a fraudulent inducement claim based on alleged misrepresentations. Fierro v. Gallucci, No. 06-CV-5189, 2008 WL 2039545, at *13 (E.D.N.Y. May 12, 2008). Accordingly, the existence of the Merger Clause does not compel the dismissal of the Plaintiff's fraud causes of action.

## 2. Reasonable Reliance

In order to defeat the motion for summary judgment on grounds of fraudulent inducement, the Plaintiff must raise a genuine issue of material fact as to whether it "reasonably relied on false representations" made by the Defendant. Fax Telecommunicaciones Inc. v. AT & T, 138 F.3d 479, 490 (2d Cir. 1998). "[R]easonable reliance is an essential element of fraudulent inducement." Psenicska v. Twentieth Century Fox Film Corp., 409 F. App'x 368, 371 (2d Cir. 2009). Under New York law, where "the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." Continental Airlines, Inc. v. Lelakis, 129 F.3d 113 (Table), 1997 WL 701363, at *3 (2d Cir. Nov. 10, 1997) (quoting Danann Realty Corp. v. Harris, 184 N.Y.S.2d 599, 603 (1959)). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003). With respect to the impact of due diligence obligations on reasonable reliance, the Second Circuit stated in Lazard Freres & Co. v. Protective Life Insurance Co., 108 F.3d 1531 (2d Cir. 1997):

> "[W]here . . . a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting the appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain

> that he has been defrauded when it is his own evident lack of due
> care which is responsible for his predicament."

Id. at 1543 (quoting Rodas v. Manitaras, 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)).

Here, there are significant factual issues regarding what information about the scope and duration of the project the parties either possessed or had access to both before and after entering into the Subcontract. See In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008) ("The question of whether a plaintiff's reliance was reasonable typically turns on plaintiff's knowledge, or access to knowledge, at the time the alleged misrepresentations were made; that is, what Plaintiff knew or should have ascertained, given the particular circumstances."). For example, Alan Smith, the Vice President of Morales testified at his deposition that Geralyn Spadafino of Siemens told him in a phone conversation on May 16, 2006 that the Work was to last two years, from late 2006 to late 2008. (Pl.'s 56.1 Add'l ¶ 22.) Giacomo Grandi, an employee of Morales, testified that Robert Hayes of Siemens told him at the Pine Brook Meeting that it was "a two-year job" with a "substantial completion" date of December 2008. (Pl.'s 56.1 Add'l ¶ 24.) However, both Spadafino and Hayes dispute these accounts. Furthermore, the Plaintiff has submitted evidence from which a reasonable juror could find that the Defendant was in possession of detailed project master schedules and general provisions documents prior to November 1, 2006 showing that the electrical installation work for the building management system would have to be completed within one year. (Pl.'s 56.1 Add'l ¶¶ 6–8.)

The record is also replete with issues of fact pertaining to the Defendant's alleged concealment of the project schedule after the Plaintiff commenced the Work, and whether and to what extent this information was otherwise available to the Plaintiff. For example, the record

contains a substantial amount of correspondence from Morales to Siemens after Morales

commenced the Work requesting copies of the JetBlue Project schedule and expressing concern

that the two year project was being compressed into a one year project. (See, e.g., Hayes Dep.,

Exs. 13, 14, 15, 21). The Defendant does not deny that it did not provide the Plaintiff with a

copy of the Project Master Schedule until April 3, 2007, and that it provided the Plaintiff with a

trade-by-trade master schedule on July 16, 2007 only after being directed to do so by Turner.

(Def.'s 56.1, ¶¶ 196, 198.) However, the Defendant provides an explanation that a reasonable

jury could find justified its actions and has submitted evidence that: (1) it was not in possession

of the various versions of the Turner master schedule the Plaintiff alleges it concealed (Def.'s

56.1, ¶¶ 177, 179); (2) the Plaintiff could have obtained a master project schedule from Turner;

and (3) the Plaintiff failed to attend weekly foreman meetings that would have provided the

Plaintiff with schedule information (Def.'s 56.1 ¶¶ 147, 150–56).

In addition, the record contains evidence submitted by both parties with respect to

whether a reasonable subcontractor would have reviewed the Turner General Provisions for

scheduling information or based its bid on an oral representation about a substantial completion

date without requesting a project schedule or written confirmation. For example, the Plaintiff's

expert, Janet Meadows, a New York State Licensed Professional Engineer and Vice President of

the Controls Division at T.M. Bier & Associates, Inc., opined in her expert report that, in the

construction industry, "[u]nless you are told to examine the 'General Provisions' document for

information pertaining to Schedule and Milestones, there is no reason why anyone in our

business would expect that such a document, by its title, would contain anything else other than

Job Conditions, Safety Rules, Submittal Process and items of general nature about conditions at

the particular project site." (Expert Report of Janet Meadows at 4.)

By contrast, the Defendant's expert, Mark I. Anderson, the Executive Vice President of Warner Construction Consultants, Inc., opined that "[t]o the extent that Morales underestimated the requirements of the Project as a result of failing to consider all available information, or asking for and obtaining all available information, Morales is responsible for any resulting underestimation of the labor, materials, equipment and/or resources required to complete the work." (Expert Report of Mark Anderson at 15.)

Finally, while a review of the Turner General Provisions or August Submittal Book would have rendered the Plaintiff's reliance on the alleged misrepresentations and omissions unreasonable as a matter of law, there is an issue of fact with respect to whether the Plaintiff was ever "put on notice" that these documents contained material information that contradicted the Defendant's alleged misrepresentations. Cf. Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 608 (S.D.N.Y. 2006) ("It is unclear whether a reasonable contractor would have been placed on notice of this condition prior to starting the dredging. These are issues that must be established at trial and are inappropriate to determine at this stage of the litigation.").

Thus, a determination as to whether the Plaintiff reasonably relied on any alleged misrepresentations or omissions involves a fact-intensive inquiry and credibility assessments that cannot be resolved on a motion for summary judgment.

### 3. The Subcontract

"Under New York law, reasonable reliance is precluded when an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion." Republic Nat'l Bank v. Hales, 75 F. Supp. 2d 300, 315 (S.D.N.Y.1999) (internal quotation marks and citation omitted); see also Bango v. Naughton, 184 A.D.2d 961, 963, 584 N.Y.S.2d 942, 944 (3d

Dep't 1992) ("[C]onflict between the provisions of the written contract and oral representations negates the claim of reliance upon the latter.").

According to the Defendant, the incorporation of the Turner General Provisions and the Project Master Schedule deem any reliance by the Plaintiff on its purported misrepresentations and omissions about the scope and duration of the project unreasonable as a matter of law. The Plaintiff contends that, because the Turner General Provisions were not attached to the Subcontract, they were not incorporated and therefore the Plaintiff is not bound by their terms.

"Whether an extrinsic document is deemed to be incorporated by reference is a matter of law." Sea Trade Co. Ltd. v. FleetBoston Fin., No. 03-CV-10254, 2007 WL 1288592, at *4 (S.D.N.Y. May 1, 2007). "To incorporate a document by reference, New York law requires that the document be referenced beyond all reasonable doubt." 4Connections LLC v. Optical Commc'ns Group, Inc., 618 F.Supp.2d 178, 183 (E.D.N.Y. 2009) (citing Chiacchia v. Nat'l Westminster Bank USA, 124 A.D.2d 626, 507 N.Y.S.2d 888, 889–90 (2d Dep't 1986)). "When a contract clearly identifies a single document, it eliminates all reasonable doubt and thus qualifies as an effective incorporation." Id. (citing Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 n. 8 (2d Cir. 1993)).

In order for a document to be deemed incorporated by reference into another instrument or agreement, the following two elements must be satisfied: (1) "the agreement must specifically reference and sufficiently describe the document to be incorporated, such that the latter 'may be identified beyond all reasonable doubt'" and (2) "'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms'". Ryan, Beck & Co., LLC. v. Fakih, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003) (quoting PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996)). "While a party's failure to read a duly incorporated document

will not excuse the obligation to be bound by its terms, a party will not be bound to the terms of any document unless it is clearly identified in the agreement." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1200 (2d Cir. 1996) (internal citations omitted).

Here, the Court finds that the Turner General Provisions was sufficiently identified in two separate provisions of the Subcontract to satisfy the first element of the incorporation analysis. First, Article 4.2 of the Subcontract incorporated the Turner-Siemens Contract, stating that:

> This Subcontract is subject to each of the drawings, specifications, addenda, terms and conditions contained or incorporated in the Contract between CONTRACTOR and the Customer (the "Contract") which are hereby incorporated by reference excluding only such terms and conditions which by ordinary and reasonable rules of construction are not applicable to the portion of the Project performed by the Subcontractor. . . .

(Id. (emphasis added).) There is no dispute that the Turner-Siemens Contract incorporated and attached the Turner General Provisions, which in turn incorporated and attached the Project Master Schedule. Although the Plaintiff contends that the Defendant had to attach the Turner-Siemens Contract in order to incorporate it, the law does not impose such a requirement. Cf. Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 150 (2d Cir. 2004) ("Moreover, while it would have made sense for Deutsche Bank to have explained the form and to have provided Gold the NASD rules that were incorporated by reference, we do not find on this record that the failure to do so renders the arbitration clause invalid."). Furthermore, the plain language of Article 4.2 incorporating the Turner-Siemens Contract does not require the Turner-Siemens Contract to be attached in order to be incorporated.

The second reference to the Turner General Provisions is in Exhibit A to the Subcontract, which is entitled "Scope of Work and Schedule of Services". Exhibit A contains two sections. Article 1 is titled "SCOPE OF THE WORK" (the "Scope Section") and Article 2 is titled

"PERFORMANCE PERIOD/SCHEDULE" (the "Schedule Section"). Article 1.3 of the Scope

Section states:

> Technical Specifications, Drawings, and Exhibits: The Work shall
> be performed in strict accordance with the following
> specifications, drawings and other attachments hereto, which are
> specifically incorporated herein and made part hereof . . . ."

(Id.) Article 1.3 of the Scope Section lists nine items, including the "Turner General Provisions

dated 3/20/06". The Plaintiff relies on the "attachments hereto" language in Article 1.3 to argue

that the Turner General Provisions and other documents listed in Article 1.3 were not

incorporated because they were not attached to the Subcontract. This argument in unavailing in

light of the fact that the Plaintiff inserted references to additional documents into Article 1.3 that

it contends are a part of the Subcontract, but which were not attached to the Subcontract. Indeed,

Alan Smith of Morales testified that he considered them part of the document.

> A. Yes. I see Section 1.3, technical specifications and drawings
> and exhibits.
> Q. And the proposed subcontract says, "The work shall be
> performed in strict accordance with the following specifications,
> drawings and other attachments hereto, which are specifically
> incorporated herein and made part hereof."
> What was your understanding of that phrase?
> A. That phrase would mean that items listed below are to be
> considered in processing our work.
> Q. Are the items listed below to be considered part of the
> subcontract?
> . . . .
> A. The items listed below are part of - - in my opinion, part of the
> contract.

(Smith Dep., 134–35.) Thus, as with the Turner-Siemens Contract, the Turner General

Provisions and the other documents referenced in Article 1.3 satisfy the first element of the

incorporation analysis.

    With respect to the second element, the Court finds that it is clear that the parties "had

knowledge of and assented to the incorporated terms" relating to the scope of the Work, but not

the duration of the Work, and therefore only the terms of the Turner General Provisions relating to the scope of the Work were incorporated into the Subcontract and binding on the Plaintiff.

It is well-settled in New York that "incorporation clauses in a construction subcontract, incorporating prime contract clauses by reference into a subcontract, bind the subcontractor . . . as to prime contract provisions relating to the scope, quality, character and manner of the work to be performed by the subcontractor." Bussanich v. 310 East 55th St. Tenants, 282 A.D.2d 243, 244, 723 N.Y.S.2d 444, 445 (1st Dep't 2001); see also S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1024 (S.D.N.Y.1984), affd., 762 F.2d 990 (2d Cir. 1985); Wonder Works Const. Corp. v. R.C. Dolner, Inc., 73 A.D.3d 511, 513, 901 N.Y.S.2d 30, 32 (1st Dep't 2010); Waitkus v. Metro. Housing Partners, 50 A.D.3d 260, 261, 854 N.Y.S.2d 388, 390 (1st Dep't 2008). However, "[p]rime contract provisions unrelated to the work of the subcontractor, such as a 'dispute' clause governing the resolution of monetary claims between the project owner and general contractor, are not incorporated by reference into a subcontract." U.S. Steel Corp. v. Turner Const. Co., 560 F. Supp. 871, 874 (S.D.N.Y. 1983) (citations omitted); see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1008 n.5 (2d Cir. 1991) (noting that a clause barring damages for delay may be incorporated into a subcontract when the incorporation is express and unambiguous).

Thus, any aspects of the Turner-Siemens Contract relating to the scope of the Work, including the terms and conditions in the Turner General Provisions that are incorporated by reference, were binding on the Plaintiff. This finding is further supported by the fact that the Turner General Provisions were included as one of the relevant scope documents in Article 1.3 of the Scope Section.

Nevertheless, on the record before the Court, the fact that the scope terms and conditions are incorporated does not automatically warrant summary judgment for the Defendant on the Plaintiff's scope fraud claims. Although the Defendant generally states that it would have been unreasonable for the Plaintiff to rely on the 23 hand-drawn sketches upon review of the Turner General Provisions, the only evidence submitted by the Defendant are expert reports comparing the 23 pages of hand-drawn sketches to the Addendum #34 drawings and the August Submittal Book. Notably, the August Submittal Book is not included as one of the relevant scope documents in Article 1.3, and in fact, as indicated by the testimony of Alan Smith at his deposition, was removed by the Plaintiff from a draft of the Subcontract to protect Morales from being bound by its contents.

> Q. Is it true that you did not want to agree to a subcontract that included the last bullet point in this section, which I will read, "Siemens Building Technologies, submitted dated 9/27/06."
> A. That was one of the items that I had inputted on in my return of the contract back to Siemens.
> Q. And what was the reason that you provided specific input on this identified item of the technical specifications, drawings and exhibits?
> A. The reason why I crossed out and changed and inputted additional information on the last bullet point listed in this subcontract was because we never saw the submittal book, and we wanted to make sure it was clear, contract was clear, that our scope was based on the 23 pages of hand draw sketches.

(Smith Dep., 125.)

Thus, at least on this record, there is a genuine issue of material fact with respect to whether the Turner General Provisions and other documents incorporated in Article 1.3 disclose that the scope of the Work was more expansive that what was represented in the 23 pages of hand-drawn sketches. As a result, although the scope terms of the Turner General Provisions were incorporated into the Subcontract, the Court denies the Defendant's motion for summary judgment dismissing the scope fraud claims.

The Court reaches a different conclusion with respect to whether the terms of the Turner General Provisions relating to the applicable schedule were incorporated by reference. Generally, "[t]he time schedule of [a] prime contract [is] incorporated into the subcontract because it relates to the scope, quality, character and manner of plaintiff's work . . . ." S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1026 (S.D.N.Y. 1984); see also Commercial Elec. Contractors, Inc. v. Pavarini Constr. Co., Inc., 5 Misc. 3d 1002(A), 798 N.Y.S.2d 708 (Table), 2004 WL 2282856, at *3 (N.Y. Sup. Ct. 2004) (holding that because the time schedule of a prime contract is incorporated into a subcontract, the "[plaintiff's] argument that time schedule issues, such as delays, are not covered by the incorporation clause in the Subcontract lacks merit").

However, "the effects of incorporation by reference may be avoided by a finding of inconsistencies between the terms of the contract signed by the parties and the incorporated documents." T. Bart Gary, Incorporation by Reference and Flow-Down Clauses, 10 Construction Law 1 (August 1990). "In the event of a conflict, a generally accepted rule of contract construction is that the provisions of the contract will govern over conflicting terms in the plans and specifications incorporated by reference." Id.; cf. Oldcastle Precast, Inc. v. U.S. Fidelity & Guar. Co., 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006) ("Under New York law, '[w]here there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.'") (quoting Aguirre v. City of New York, 214 A.D.2d 692, 693, 625 N.Y.S.2d 597 (2d Dep't 1995)); Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001).

Under Article 2 of the Subcontract titled "TIME OF PERFORMANCE", the Subcontract states "SUBCONTRACTOR shall prosecute and complete all Work under the Subcontract in

accordance with the schedule in Exhibit A". Absent from this provision is any reference to performing the Work in accordance with the Turner-Siemens Contract or documents incorporated into the Subcontract. Moreover, the relevant portions of the Schedule Section of Exhibit A state as follows:

> Article 2: PERFORMANCE PERIOD/SCHEDULE
> 2.1 Term: SUBCONTRACTOR shall commence the Work on September 21, 2006, and shall prosecute the Work diligently as required by the project schedule to allow for project completion on or before December 2008." [the "Term Provision"]
>
> 2.2 Milestones: Specific scheduling milestones and coordination requirements are as follows: [the "Milestone Provision"]
>
> 2.3 Time of Essence: Time is of the essence in the performance of this Work. SUBCONTRACTOR shall make whatever adjustments in working hours, manpower, equipment, etc. deemed necessary to complete the Work in accordance with the term of the Subcontract and the specific schedule requirements hereof.

Unlike the Scope Section of Exhibit A, the Schedule Section does not make any reference to the Turner General Provisions. Although the Term Provision references a "project schedule", there is no indication that this "project schedule" is the Project Master Schedule attached to the Turner General Provisions or any other project master schedule. Furthermore, the Milestones Provision is blank, despite the fact that the Turner General Provisions include the temporary heat deadline milestone. The Court cannot say as a matter of law that a blank space, rather than a "yes" or a reference to the Turner General Provisions, indicates that the Plaintiff "had knowledge of and assented to" the incorporation of the temporary heat milestone, particularly in light of the fact that Article 2 of the Subcontract identifies the governing schedule as appearing in the Schedule Section of Exhibit A, not the documents incorporated into the Subcontract.

Nevertheless, both parties contend that the plain language of the Term Provision supports their respective positions. The Defendant characterizes the Term Provision as referring to the

final completion of the JetBlue Project. If true, then the Subcontract is silent with respect to the Plaintiff's substantial completion date, and, for breach of contract purposes, the relevant inquiry is whether the Plaintiff was required to complete the Work prior to December 2008. There is no dispute that the Plaintiff was still performing the Work, even if only minimally, until at least November 2008. (Pl.'s 56.1, ¶ 230.) Thus, if the Term Provision is properly interpreted under the Defendant's definition, then it is unlikely that the Plaintiff can maintain the acceleration breach of contract claim. However, because, under the Defendant's characterization, the alleged misstatements and omissions regarding the Plaintiff's substantial completion date would be collateral or extraneous to the Subcontract, the Plaintiff could maintain its duration fraud claims.

By contrast, the Plaintiff defines "project completion" as "substantial completion" and the "project" as the "electrical subcontract work for the building management system being installed as part of [the JetBlue] project". (Pl.'s 56.1, ¶ 1–2.) Thus, under the Plaintiff's interpretation, the Term Provision confirms the alleged representations that the Work had to be substantially completed by December 2008. If true, then the alleged misrepresentation and omissions with regard to the Plaintiff's substantial completion date were not collateral or extraneous to the Subcontract, but rather were the actual terms of the Subcontract. As a result, the Plaintiff's duration fraudulent inducement claim would likely be subject to dismissal as duplicative of its breach of contract claim, but the acceleration breach of contract claim would survive.

"[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). "The existence of ambiguity is determined by examining the 'entire contract and

consider[ing] the relation of the parties and the circumstances under which it was executed,' with the wording to be considered 'in the light of the obligation as a whole and the intention of the parties as manifested thereby'". Goldman Sachs Group, Inc. v. Almah LLC, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (quoting Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S. 2d 350, 696, N.E.2d 174) (1998)) (alteration in original). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." Topps Co., 526 F.3d at 68.

Here, the parties dispute centers on whether: (1) the word "project" refers to the JetBlue Project or the FMS Work and (2) the phrase "project completion" means final completion or substantial completion. Turning to the plain language of the Subcontract, the Court notes that in the Term Provision, "project" is spelled with a lowercase "p". However, the JetBlue Project was defined in the Subcontract as "Project", with a capital "P", and every other reference to the JetBlue Project in the Subcontract refers to it as the "Project" with a capital "P". Thus, the Court cannot say as a matter of law whether the entire Jetblue Project, or only the FMS Work, is the "project" referenced in the Term Provision.

Moreover, it is a general principle of construction law that "[u]nless otherwise defined by the contract to mean 'final completion'–the date on which the work is 100% complete, 'completion' ordinarily is understood to mean 'substantial completion'–the date on which all material elements of the work are sufficiently complete in conformance with the contract so that the owner can use the work for its intended purpose." See 5 Brunner & O'Connor Construction Law § 15.15. However, the phrase "project completion" is not defined in the Subcontract, and

the parties have not sufficiently addressed this issue to permit the Court to make a finding at this stage about its intended meaning as a matter of law.

Thus, the Court finds that the Term Provision is ambiguous in that it could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire Subcontract and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. See Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990); see also World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003). The Court finds that it cannot discern the parties intended meaning as a matter of law. Thus, the Court denies the Defendant's motion for summary judgment on the ground that the Subcontract deems the Plaintiff's reliance on its alleged misrepresentations and omissions about the duration of the Work unreasonable as a matter of law.

## C. Whether the Defendant is Entitled to Summary Judgment on the Acceleration Breach of Contract Claims

With respect to the acceleration breach of contract claim, Morales contends that Siemens breached the Subcontract by accelerating its work because "the Subcontract called for the work to be performed within a two-year window, i.e., by the end of December 2008, and it is undisputed that in August 2007, Morales was informed that it had to substantially complete its performance by October 2007". (Pl.'s Br. at 23.) The Defendant seeks summary judgment on this cause of action under three theories.

First, the Defendant contends that the plain language of the Subcontract permitted it to accelerate the Work. This argument was raised by the Defendant and rejected by the Court in its February 16, 2010 decision on the motion to dismiss. The Court adheres to its decision on this

issue in the motion to dismiss, and denies the Defendant's motion for summary judgment on this ground.

Next, the Defendant argues that, because the Turner General Provisions and the Project Master Schedule as incorporated into the Subcontract disclosed the relevant deadlines, the Plaintiff's acceleration breach of contract claim fails because, as a matter of law, there was no acceleration. As discussed previously, there are issues of fact precluding the Court from resolving this issue as a matter of law. Moreover, the Plaintiff has also submitted documentary evidence suggesting that the Defendant knew that the Plaintiff was unaware of the temporary heat deadline until the Work was well underway, and that it may be entitled to additional compensation based on acceleration. (See Ex. 9 at Ex. 14.)

Finally, the Defendant seeks summary judgment on the acceleration breach of contract claim on the ground that it cannot be held liable for breaching the Subcontract because the Plaintiff did not perform its own contractual obligations. The Court has reviewed the record and the parties' arguments and finds that the resolution of this issue presents issues of fact that preclude a finding of summary judgment. Accordingly, the Court denies the Defendant's motion for summary judgment dismissing the acceleration breach of contract claim.

## D.  Whether the Defendant is Entitled to Summary Judgment on the Scope Breach of Contract Claims

The Plaintiff argues that the Defendant breached the Subcontract by refusing to pay fair value for the additional work reflected in four change orders and has refused to compensate it for the additional work associated with ten other change orders. The Defendant seeks summary judgment on the ground that the change orders fairly compensated the Plaintiff, and that the Plaintiff waived its right to additional compensation by signing the change orders.

There is no dispute that the Subcontract permitted the Defendant to direct the Plaintiff to perform work outside the scope of the Subcontract, as long as the Plaintiff was compensated for those changes. The Defendant cites to the expert report of Mark Anderson, setting forth why the additional work was not outside the scope of the project, and why the amounts that Siemens paid for the work was consistent with the work provided. For its part, the Plaintiff does not provide any evidence, expert or otherwise, to support its contention that it was underpaid for the changes. (Pl.'s 56.1, ¶ 227.) However, whether the Plaintiff was adequately compensated for these changes turns in large part on whether the Plaintiff was operating under an accelerated schedule, and whether it was performing work outside the scope and duration of what it reasonable relied upon in submitting its bid.

Moreover, while the Plaintiff may have signed the change orders, the Plaintiff has submitted evidence that: (1) the parties were not adhering to the change order procedure as set forth in the Subcontract because the Plaintiff was directed to perform the additional work prior to the change orders being signed and (2) the Defendant allegedly led the Plaintiff to believe that any discrepancies between the amount the Plaintiff believed was owed and the amount paid could be resolved through an equitable adjustment at the conclusion of the Work. Thus, the Court cannot say as a matter of law that the Plaintiff waived its right to contest those change orders after the fact. Accordingly, the Court finds that there are genuine issues of material fact and denies the Defendant's motion for summary judgment dismissing the scope breach of contract claims.

## E. Whether the Defendant is Entitled to Summary Judgment on the Plaintiff's Damages

The Defendant seeks summary judgment dismissing the Plaintiff's "indirect, consequential, and alleged damages beyond the scope of its out out-of-pocket losses, whether

asserted as contract or fraud damages". (Reply Br. at 10.) However, based on the Court's review of the record and the applicable caselaw, the Court finds that it is inappropriate to make a finding as to the available damages at this stage in the litigation. Accordingly, the Court denies the Defendant's motion for partial summary judgment on the Plaintiff's claim for damages without prejudice to renewal at or after trial.

## III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's fraudulent inducement cause of action is DENIED, and it is further

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's fraudulent concealment cause of action is DENIED, and it is further

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's acceleration breach of contract cause of action is DENIED, and it is further

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's change order breach of contract causes of action is DENIED, and it is further

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's claim for consequential and indirect damages is DENIED, without prejudice, and it is further

**ORDERED**, that jury selection in this case will take place on April 9, 2012 at 9:00am.

**SO ORDERED.**

Dated: Central Islip, New York
March 28, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge